J-S01045-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| C.Z. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| Z.M. | : | |
| | : | |
| Appellant | : | No. 947 MDA 2017 |

Appeal from the Order Entered May 25, 2017
In the Court of Common Pleas of Luzerne County
Civil Division at No(s):  2017--6444

BEFORE:  GANTMAN, P.J., MURRAY, J., and MUSMANNO, J.

MEMORANDUM BY GANTMAN, P.J.:                 **FILED MAY 25, 2018**

Appellant, Z.M., appeals from the order entered in the Luzerne County Court of Common Pleas, which granted the petition of Appellee, C.Z., filed under the Protection from Abuse ("PFA") Act.[1]  We affirm.

The relevant facts and procedural history of this case are as follows.  On May 18, 2017, Appellee filed a petition for a PFA order against Appellant claiming, *inter alia*, Appellant followed her and called her incessantly after Appellee had ended their dating relationship.  The court issued a temporary PFA order that day and held a PFA hearing on May 25, 2017.  Testimony at the PFA hearing established:

> [Appellee] and [Appellant] began a dating relationship after they met in December 2015 at an Alcoholics Anonymous

---

[1] 23 Pa.C.S.A. §§ 6101-6122.

("AA") meeting in Duryea. The relationship ended in December 2015 after four dates.[2] On the fourth date, [Appellant] asked [Appellee] how she felt about him, to which she responded that she "only wanted to be friends." [Appellant] did not respond well to [Appellee's] statement and continuously called and texted [Appellee] in an attempt to change her mind. The repeated contacts frightened [Appellee] and she noted that he acted in an "obsessive" [manner].

After the relationship ended, [Appellant] continuously followed [Appellee]. [Appellee] attested that she is eight and one half years sober and attended AA meetings for six years. She stated that her "home" AA meeting facility was in Avoca, Pennsylvania. After the relationship ended, [Appellant] stopped attending AA meetings in September 2016 as she was "afraid to go…because [Appellant] was always there."

During the week of May 8, 2017, [Appellee] parked her car in a back parking lot of her house. When [Appellee] left to go to work around 2:00 P.M., she saw [Appellant] walking down the alleyway, but no conversation took place. On May 16, 2017, while [Appellee] was driving to her sister's house…, [Appellant] "sped up on [Appellee's] bumper at a stop light, and [Appellee] was afraid to turn, [as Appellant] was so close to [her]." When [Appellee] left her sister's house and was again driving in her car, [Appellant] "flew up on [Appellee's] bumper…beeping his horn and everything." [Appellee] was frightened of [Appellant] as she stated that she did not "know what he's capable of. Further, [Appellee] thought he was going to hit [her]."

Corroborating these events, [Appellee's] sister…confirmed that she heard and saw [Appellant] honking at [Appellee] outside her house and then witnessed [Appellant] pass around [Appellee]. [Appellee] then came into [her sister's] house crying, shaking, and frightened. [Appellee's sister] stated that [Appellee] always contacted her after seeing [Appellant]. [Appellee's sister] observed that [Appellee's]

_____

[2] After their second date, Appellant gave Appellee a Garmin watch worth approximately $300.00. Appellee did not accept the gift.

demeanor was always "scared, crying, a mess." …

[Appellee] also saw [Appellant] multiple times while jogging/running. Based upon her ongoing fear of [Appellant], [Appellee] would call her sister whenever…she went on a run and to and from work. [Appellee's sister] also received multiple texts from unknown numbers whenever [Appellee] went on a run, stating "[e]arly morning run again today?" [Appellee's sister] always confirmed with [Appellee] that she saw [Appellant] while running, stating, "[i]t always seemed to be when [Appellee] had [seen Appellant,] I got the text." Based on her fear of [Appellant] following her while running, [Appellee] asked her sister's husband to drive her to local school running tracks and had him wait until she finished exercising.

[Appellant] also visited [Appellee's] employment three times after the relationship ended. [Appellant] twice visited [Appellee] at her job at GNC in 2016. [Appellant] then visited [Appellee] at her following job at Core Fitness and Rehab.

On May 18, 2017, [Appellee] filed a PFA against [Appellant] in the Luzerne County Courthouse. [Appellee's] friend from church, [J.M.], accompanied her. On the way out of the courthouse, [Appellee] saw [Appellant] and gave an officer the PFA, who then served it on [Appellant]. While the officer served [Appellant], [Appellee] "collapsed," and was "sobbing, crying, her knees kind of gave out. She was sitting on the steps." [J.M.] stated that she had never "seen that side of [Appellee]."

[Appellee] was forced to change her cell phone number in October 2016, due to [Appellant's] constant harassment. [Appellee] received "hang-up calls" two to three times per day, every day, from unknown numbers, one of which was from the Second Presbyterian Church, where [Appellee] and [Appellant] used to attend AA meetings. In addition to phone calls, [Appellee] received multiple text messages per day from unknown numbers saying "nasty things about me."

[Appellant] also testified at the hearing stating that [Appellee] followed him in the past on numerous occasions.

[Appellant] runs every day from his Moosic house, passing [Appellee's] house in Avoca, to his Dupont house, because he was training to take the test to obtain employment in the Wilkes-Barre Police Department. [Appellant] would run in the alleyway behind [Appellee's] house, as he knew [Appellee] usually parked on Main Street in Avoca, and not in the parking lot behind her house. [Appellant] also stated that he was honking at [Appellee] on May 16, 2017, because she did not drive forward when the light turned green at the stoplight, so he pulled around her. Later on the same day, as [Appellant] was driving to his house in Moosic, [Appellee] pulled out in front of him and slammed on her brakes, forcing [Appellant] into the oncoming lane. In another instance while [Appellant] was driving, he pulled out from being parked on the side of the road and noticed [Appellee] behind him "a distance back," which prompted him to take pictures of her car. [Appellant] further testified that while he was sitting in his parked car at the [convenience] store closest to [Appellee], [Appellee] "rolled up" next to [Appellant's] car, and then pulled away.

(Supplemental Trial Court Opinion, filed April 25, 2018, at 5-8) (internal citations omitted).

At the conclusion of the hearing, the court entered a final PFA order prohibiting Appellant from contact with Appellee for three years.[3] The court entered an amended order on June 8, 2017, to fix a scrivener's error. Appellant timely filed a notice of appeal on June 9, 2017. By order entered June 26, 2017, with Pa.R.C.P. 236 notice issued the next day, the court directed Appellant to file a concise statement of errors per Pa.R.A.P. 1925(b), within 30 days. On July 21, 2017, Appellant inadvertently filed his concise

_____

[3] Appellant had also filed a PFA petition against Appellee, which the court denied after the hearing. Appellant does not challenge the court's denial of his PFA petition on appeal.

- 4 -

statement in the Superior Court. The certificate of service and proofs of service, however, indicate Appellant served opposing counsel and the trial judge with the statement. Nevertheless, the trial court issued a Rule 1925(a) opinion, stating Appellant had failed to file a Rule 1925(b) statement, constituting waiver of all issues on appeal. Consequently, the trial court declined to address any of Appellant's issues on the merits.

On February 6, 2018, this Court remanded for the trial court to grant Appellant leave to file the same Rule 1925(b) statement *nunc pro tunc* immediately with the Luzerne County Prothonotary, and to serve opposing counsel and the trial judge again. Appellant complied, and the trial court subsequently issued a supplemental Rule 1925(a) opinion.

Appellant raises the following issues for our review:

> WHETHER [APPELLEE] HAS STANDING SUFFICIENT TO BRING AN ACTION FOR PROTECTION FROM ABUSE AGAINST [APPELLANT]?
>
> WHETHER THE RECORD INDICATES THAT [APPELLEE] WAS EITHER IN REASONABLE FEAR OF IMMINENT BODILY HARM OR [APPELLANT] KNOWINGLY ENGAGED IN A COURSE OF CONDUCT OR REPEATEDLY COMMITTED ACTS TOWARD [APPELLEE] WHICH PLACED [APPELLEE] IN REASONABLE FEAR OF BODILY INJURY?
>
> WHETHER THE CONDUCT OF THE PRESIDING JUDGE IN INTERRUPTING [APPELLANT] AND COUNSEL FOR THE DEFENSE SHOWED BIAS AGAINST [APPELLANT] PRIOR TO THE CONCLUSION OF THE HEARING?

(Appellant's Brief at 4-5).

"In the context of a PFA order, we review the trial court's legal

conclusions for an error of law or abuse of discretion." ***Stamus v. Dutcavich***, 938 A.2d 1098, 1100 (Pa.Super. 2007) (quoting ***Drew v. Drew***, 870 A.2d 377, 378 (Pa.Super. 2005)). "When interpreting statutes, we exercise plenary review." ***Stamus, supra*** (internal citation and quotation marks omitted). Additionally, "[t]his [C]ourt defers to the credibility determinations of the trial court as to witnesses who appeared before it." ***Karch v. Karch***, 885 A.2d 535, 537 (Pa.Super. 2005).

"The purpose of the PFA Act is to protect victims of domestic violence from those who perpetrate such abuse, with the primary goal of advance prevention of physical and sexual abuse." ***Buchhalter v. Buchhalter***, 959 A.2d 1260, 1262 (Pa.Super. 2008) (quoting ***Custer v. Cochran***, 933 A.2d 1050, 1054 (Pa.Super. 2007) (*en banc*)). "[T]he Protection From Abuse Act does not seek to determine criminal culpability. A Petitioner is not required to establish abuse occurred beyond a reasonable doubt, but only to establish it by a preponderance of the evidence." ***Snyder v. Snyder***, 629 A.2d 977, 982 (Pa.Super. 1993). "A preponderance of the evidence is defined as the greater weight of the evidence, *i.e.*, to tip a scale slightly is the [criterion] or requirement for preponderance of the evidence." ***Karch, supra*** at 537 (internal citation and quotation marks omitted).

In his first issue, Appellant argues Appellee lacked standing to bring a PFA action against him. Appellant asserts the PFA provides relief from abuse to several categories of people including current or former sexual or intimate

partners. Appellant concedes he briefly dated Appellee, but he contends their courtship did not rise to the level of a "romantic relationship" for purposes of the statute. Appellant highlights that he went on only four dates with Appellee and emphasizes Appellee's testimony at the PFA hearing that she "barely even knew" Appellant. Appellant insists the record contains no evidence showing a sexual relationship between the parties or any type of romantic bond. Appellant maintains the parties merely shared a brief friendship while they dated. Appellant concludes Appellee lacked standing to bring a PFA action against him, and this Court should reverse the PFA order and dismiss the matter. We disagree.

To have standing to bring a PFA action, the plaintiff and defendant must be "family or household members, sexual or intimate partners or persons who share biological parenthood." 23 Pa.C.S.A. § 6102(a). In other words, persons protected by the Act "have a connection in blood, marriage, family-standing, or a chosen romantic relationship." **Scott v. Shay**, 928 A.2d 312, 315 (Pa.Super. 2007). A dating relationship meets the relationship requirement of the Act. **Varner v. Holley**, 854 A.2d 520 (Pa.Super. 2004). **See also Evans v. Braun**, 12 A.3d 395 (Pa.Super. 2010) (holding appellee had standing to bring PFA action against appellant, where evidence showed parties mutually chose to enter dating relationship which involved romantic bond, albeit short-lived, as parties had been on only two dates together); **Scott, supra** (explaining persons involved in dating relationships are

protected by Act because they have elected some measure of personal interaction, which often involves emotional or private concerns).

Instantly, the record shows the parties met around December 2015, at an AA meeting and decided to enter a dating relationship. After their second date, Appellant offered Appellee a Garmin watch worth approximately $300.00 as a gift. Appellant knew Appellee was a marathon runner and this type of watch is specifically for runners. Appellee did not accept the watch because, after only two dates, she felt she barely knew Appellant and did not feel right about keeping it. After their fourth date, Appellant asked Appellee how she felt about him; and Appellee said she just wanted to be friends. Appellant subsequently texted and called Appellee incessantly in an effort to change her mind. Under these facts, the parties "elected some measure of personal interaction" and chose to engage in a dating or "romantic relationship" sufficient for purposes of the PFA. *See* 23 Pa.C.S.A. § 6102(a); ***Evans, supra***; ***Scott, supra***; ***Varner, supra***. Thus, Appellee had standing to bring a PFA action against Appellant; and Appellant's first issue merits no relief.[4]

In his second issue, Appellant argues Appellee failed to establish Appellant committed "abuse" as defined in the PFA Act. Appellant admits Appellee testified she is afraid of Appellant, but he claims Appellee also

_____

[4] Notably, Appellant also filed a PFA petition against Appellee, which the court denied after the PFA hearing. Thus, Appellant's challenge to Appellee's standing is disingenuous.

conceded Appellant did not ever injure her or threaten to injure her. Appellant emphasizes he lives near Appellee and frequently drives between his house and his aunt's house. Appellant insists Appellee lives directly between Appellant's house and his aunt's house, which explains why the parties have seen each other since they stopped dating. Appellant claims there is no history of violence or physical abuse in this case. Appellant maintains there is no evidence he placed Appellee in reasonable fear of imminent serious bodily injury or engaged in a course of conduct, or repeatedly committed acts, which placed Appellee in reasonable fear of bodily injury. Appellant concludes the evidence was insufficient to warrant a PFA order in this case, and this Court should reverse the PFA order and dismiss the matter. We disagree.

The PFA Act defines "abuse" as follows:

### § 6102. Definitions

**(a)  General rule.**—The following words and phrases when used in this chapter shall have the meanings given to them in this section unless the context clearly indicates otherwise:

**"Abuse."** The occurrence of one or more of the following acts between family or household members, sexual or intimate partners or persons who share biological parenthood:

*     *     *

(2)  Placing another in reasonable fear of imminent serious bodily injury.

*     *     *

(5) Knowingly engaging in a course of conduct or repeatedly committing acts toward another person, including following the person, without proper authority, under circumstances which place the person in reasonable fear of bodily injury. …

23 Pa.C.S.A. § 6102(a)(2), (5). "When a claim is presented on appeal that the evidence is not sufficient to support an order of protection from abuse, the reviewing court must view the evidence in the light most favorable to the verdict winner, granting her the benefit of all reasonable inferences." *Mescanti v. Mescanti*, 956 A.2d 1017 (Pa.Super. 2008) (internal citation and quotation marks omitted). "The reviewing court then determines whether the evidence was sufficient to sustain the [trial] court's conclusions by a preponderance of the evidence." *Id.*

Under 23 Pa.C.S.A. § 6102(a)(2): "In the context of a PFA case, the court's objective is to determine whether the victim is in reasonable fear of imminent serious bodily injury. The intent of the alleged abuser is of no moment." *Buchhalter, supra* at 1263. Physical contact is not a pre-requisite for a finding of abuse under Section 6102(a)(2) of the Act. *Fonner v. Fonner*, 731 A.2d 160 (Pa.Super. 1999). As the goal of the Act is to prevent physical and sexual abuse, a victim does not have to wait for physical or sexual abuse to occur for the Act to apply. *Id.* *See also T.K. v. A.Z.*, 157 A.3d 974 (Pa.Super. 2017) (holding appellee established abuse under Section 6102(a)(5) of Act, where appellant repeatedly followed appellee in his vehicle, in local grocery store, at sporting events, and in other locations; appellant also

kept track of appellee's whereabouts and constantly drove past her home and honked car horn; appellee testified about deep concern for her safety and fear that appellant's behavior would eventually escalate to cause her bodily harm); *R.G. v. T.D.*, 672 A.2d 341 (Pa.Super. 1996) (holding appellee established abuse under Section 6102(a)(5) of Act, where appellant repeatedly called appellee and sent her unwanted, threatening e-mails; appellee testified she was "very scared" by appellant's increasingly hostile messages and was afraid to walk around campus).

Instantly, the trial court explained:

> [T]he record in the present case supports the PFA Order because [Appellant's] stalking and harassment placed [Appellee] in reasonable fear of bodily injury. [Appellant] constantly stalked [Appellee] while driving and running, visited her employment, appeared at her AA meetings, and continuously contacted [Appellee] and her family. [Appellee] stopped going to AA meetings, called [her sister] going to and from work, had [her sister's] husband wait at a school track while [Appellee] exercised, and changed her cell phone number. [Appellee] would call her sister scared and crying every time she saw [Appellant]….
>
> The testimony…provided the necessary elements of abuse as defined by the statute. The review of the record and testimony clearly indicate that [Appellee] proved the allegations of abuse by a preponderance of the evidence.

(Supplemental Trial Court Opinion at 9). We see no reason to disrupt the court's analysis. *See Stamus, supra*. The trial court was free to reject Appellant's version of events in favor of Appellee's testimony. *See Karch, supra*. Viewed in the light most favorable to Appellee as the verdict winner, the record demonstrates that Appellee established Appellant's abuse under

- 11 -

the Act.[5]  **See** 23 Pa.C.S.A. § 6102(a)(2), (5); ***Mescanti, supra***.  **See also** ***T.K., supra***; ***Fonner, supra***; ***R.G., supra***.  Therefore, Appellant's second issue on appeal merits no relief.

In his third issue, Appellant argues the court interrupted Appellant's testimony during direct and cross-examination on several occasions. Appellant concedes the court was trying to clarify issues in some instances, but he insists some of the court's questions demonstrated a bias against Appellant.  Appellant claims some of the court's questions improperly sought to test his credibility.  Appellant maintains the court engaged in protracted and unnecessary questioning of Appellant.  Appellant concludes the court showed bias against him, and this Court should reverse the PFA order and dismiss the matter.  We disagree.

Allegations of bias and prejudice constitute some of the most serious charges which can be hurled against a court. ***Kenworthy v. Burghart***, 361 A.2d 335, 338 (Pa.Super. 1976), *appeal dismissed*, 478 Pa. 20, 385 A.2d 975 (1978).  Before reversal is warranted on these grounds, the record must clearly show prejudice, bias, capricious disbelief or prejudgment.  ***Id.***  "When the trial [court] is assailed as lacking impartiality, the only way to meet this point is to examine the testimony [as a whole], not depending upon sentences plucked out here and there." ***Id.***

_____

[5] The record supports the trial court's finding of abuse under either subsection (a)(2) or (a)(5).

Instantly, the trial court explained:

> [Appellant's]…alleged error is baseless and wholly without merit. Pursuant to Pennsylvania Rule of Evidence 614(b), a judge may examine a witness in the interest of justice, regardless of who calls the witness. In the case at bar, the [t]rial [c]ourt asked questions of both parties in an attempt to adduce testimony to determine whether the Petition was meritorious. [The c]ourt only interrupted [Appellant] when he was talking off topic or restating his previously mentioned testimony. Defense counsel was free to ask [Appellant] any relevant questions that were pertinent [to] his case.

(Supplemental Trial Court Opinion at 14). We agree. The record and the PFA hearing transcript as a whole make clear the court remained impartial and treated both parties equally. **_See Kenworthy, supra_**. Therefore, Appellant's third issue merits no relief. Accordingly, we affirm.

Order affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 05/25/18

- 13 -